# Converse Bridge Co., *et al.* *v.* Geneva County.

*Bill to Cancel County Warrants and Recover Money Paid on Contracts.*

(Decided Dec. 21, 1909. Rehearing denied June 30, 1910. 53 South. 196.)

1. *Cancellation of Instruments; County Warrants; Grounds of Relief.*—Where county warrants have been issued in payment of the cost of a bridge which the contractors agreed to build in a workmanlike manner, and the bridge collapses a year after its building on account of the unworkmanlike manner of its construction, the county may maintain a bill in equity to cancel the warrant and recover the money paid on the contract.

2. *Counties; Audit and Allowance of Claim; Conclusiveness on Account.*—In auditing and allowing claim courts of county commissioners act in the exercise of their executive or administrative power and do not act judicially, and hence, their action is not conclusive against the county.

3. *Contracts; Construction; Bridges; Performance.*—A contract and evidence stated and examined and it is held that the evidence is not sufficient to establish that the principal pier of the bridge rested on a part of the fallen pier, thus causing the new pier to lean upstream.

4. *Same.*—The evidence stated and held to show that sand was not removed from inside the casing of the principal pier of the bridge and that in a workmanlike construction of the bridge it should have been removed.

[Converse Bridge Co., et al. v. Geneva County.]

5. *Same.*—The evidence stated and held to show that a better foundation could have been secured for the principal pier of the bridge than was procured.

6. *Same.*—The evidence stated and examined and held insufficient to show that the fall of the bridge was caused by cross currents or by an unusual freshet causing logs and other debris to strike against the principal piers of the bridge.

7. *Same; Construction; Performance.*—Where contractors agreed to build a bridge in a workmanlike manner at a particular location, they were bound to procure a solid foundation for the principal pier though they might thereby have been deprived of all profits or have sustained a loss, even, though the location of the bridge was selected by the complainant.

8. *Equity; Jurisdiction; Retention for Other Purposes.*—Where a court of equity has once obtained jurisdiction of a controversy for any purpose, it will retain jurisdiction for the purpose of administering complete relief, and relief of an equitable character may be obtained incidentally even though an original bill will not lie for that relief alone.

9. *Same; References; Determination of Facts and Amount of Damages.*—Where the bill was to cancel county warrants issued for the cost of the building of a bridge and to recover payments made, and the evidence was in conflict as to the amount of the materials from the old bridge used by the county in constructing the new after the fall of the other, a reference may be properly ordered to determine that fact and the amount of damage.

10. *Damages; Breach of Contract; Measure.*—In an action to cancel county warrants issued in payment of the cost of the construction of a bridge, and to recover payments made thereon, the measure of damages is the difference between the value of the bridge as constructed and its value if it had been constructed in accordance with the contract.

Mayfield, J., dissenting.)

APPEAL from Geneva Chancery Court.

Heard before Hon. L. D. GARDNER.

Bill by Geneva County against the Converse Bridge Company and others. Decree for complainant, and respondents appeal. Affirmed.

The following is the chancellor's opinion, which becomes the opinion of the court:

"The bridge which forms the subject-matter of this suit was built by respondent Converse Bridge Company, under contract with complainant, according to plans and specifications. The bridge stood for a period

of 12 months, when it fell. Before its fall the county of Geneva had paid the sum of $2,480, and had given warrants for the balance of the contract price, payable at different times. The bill is filed for the cancellation of these outstanding warrants and a judgment against respondent Converse Bridge Company, for the money heretofore paid for it; the insistence being by complainant that there has been a failure of consideration, in that the bridge fell in so short a period on account of it being defectively constructed. The bill is filed under authority of *Commissioners' Court v. Moore,* 53 Ala. 25, from which I quote the following language for convenience: 'If it (commissioners' court) audits and allows a claim not properly and legally chargeable on the county, or which it has no authority to allow, it exceeds the power with which it is intrusted, and as the act of a corporation which is ultra vires is void, so is the action of the court. Or if upon false evidence it should be lured into the allowance of an unjust claim, or should allow a claim, which was wanting in consideration, or the consideration of which failed, the county would not be estopped from defending against it. The audit and allowance has no more force and effect than a settlement between individuals. It is a simple admission by the court of county commissioners that there is a valid, subsisting debt due and owing by the county. The admission prima facie fixes a liability on the county. So if a settlement is had between individuals, and the one makes his note or bond payable to another for an ascertained balance, a prima facie debt is established. In each case the burden of impeachment rests on him who questions the prima facie evidence. If, after the audit and allowance, a warrant pursuant to the statute is drawn on the county treasurer, it is a mere authority to him to pay. It is nothing

[Converse Bridge Co., et al. v. Geneva County.]

more really than an order on the county itself. the debt-or.—Dillon, Munic. Corp. §§ 406-412. When such war-rants have been illegally issued, issued without author-ity, or when any just defense exists against the claim which they evidence, the county may maintain a bill in equity for their cancellation. And this we incline to regard as the most appropriate remedy.' If these ex-pressions be taken for their face value, it can hardly be denied that the bill in this case is properly filed.

"Counsel for respondent, however, insist that what is said in this opinion, from which the above quotations are taken, is and should be treated as dictum, and is therefore of no binding force. While it may be true that these expressions were not absolutely necessary to the decision of that case, yet at the same time it will be noticed that the distinguished Chief Justice Brickell, who was the author of the opinion, was pointing out to the appellant, the county, the appropriate form in which relief could be had, if in fact any just defense existed as against the claim evidenced by the warrants which had been issued. The language certainly was the most ap-propriate to that particular case and its status at that time. Furthermore, the opinion shows that these ex-pressions are founded on equitable principles and sound reasoning. After the issuance of the warrant the claim ceases to be the subject of a suit in the ordi-nary mode against the county, and the right to apply to a court of equity for the cancellation of the warrant is based upon the broad principle of the inadequacy of legal remedies. The principles announced in *Commis-sioners' Court v. Moore, supra,* have been reaffirmed by our Supreme Court in the case of *Jeffersonian Publish-ing Co. v. Hilliard,* 105 Ala. 576, 17 South. 112, using these words: 'If the claims which are audited and al-lowed are not, as they now appear to be, legally charge-

able on the county, or if there be any just defense against them, or if they be excessive, when the warrant issues for their payment, the county may maintain a bill in equity for its cancellation, or its reduction to the amount justly due.'—*Commissioners' Court v. Moore,* 53 Ala. 25. I can find nothing in our decisions at variance with the principles announced in the case from which the quotations have been here taken. This court has no inclination to refuse to follow these decisions, nor have I been given any satisfactory reason for doing so. Neither would I have the right, in my opinion, to so refuse, if so inclined. The bill, therefore, in my judgment, has equity.

"It is next insisted by respondent that the bill shows that the commissioners' court of Geneva county accepted the bridge and audited and allowed the claim, and that this was a judicial act, binding and conclusive upon it in this case. The cases of *Commissioners' Court v. Moore and Jeffersonian Pub. Co. v. Hilliard, supra,* expressly decide that the commissioners' court, in the audit and allowance of claims, is in the exercise of administrative or executive, not the judicial, power. I think these decisions decisive of this question, also, adversely to respondent.

"The evidence in the case is rather voluminous, and I do not see that any good purpose would be served by an extended discussion of the testimony, but will merely state my general observations concerning it, and the conclusions reached. Practically the entire weight of the bridge rested upon what is known in this case as the center pier, and the determination of this controversy hinges upon the fact whether or not this center pier was properly constructed. The bridge was to be constructed in a 'good, workmanlike manner.' One of the allegations of the bill as to defective construction

of this center pier was .that one end of the pier rested upon a part of a fallen pier, which caused the pier to lean upstream. This to my mind is not satisfactorily established by the evidence. Only one witness testifies positively as to this (and this must have been his opinion only), while several witnesses testify positively to the contrary. The weight of the evidence, therefore, appears to be against this theory, and this is disposed of without further comment.

"It is next insisted by complainant that the sand was not removed from inside the casing, and that this sand should have been so removed, and the piling driven deeper, that the casing thereby be lowered to better foundation. Quite a number of witnesses testify that the sand was not so removed, while I do not find any witnesses to the contrary, except Mr. Richmond, the superintendent of the work, who states that sand was removed by the use of long-handled shovels. The great weight of the evidence, therefore, establishes that the sand was not removed, and I am also convinced that this should have been done. The reasons therefor commend themselves to one's common sense, if, indeed, the testimony of Richmond that the sand was removed would not be considered as an admission from him as an experienced bridgeman that there did exist a necessity for this to be done. To this extent it appears this center pier was not properly constructed. Furthermore, the evidence is without conflict that while this center pier was in course of construction, and after a few sections of the casing had been sunk, the casing was lower on one side than the other and was leaning upstream, caused from the sand being washed from under the foundation. It is further well established by the evidence that sacks of cement were thrown on the outside of the casing in order to stop this and also

level the casing, but that the casing was still uneven, and when another section was placed holes were bored in the casing lower down, and this section so fit in as to make it level. But did this make the casing even up to that point? Certainly not; but respondent contends that this uneven condition of the casing did not in any manner affect the pier in its durability, that the casing is but the shell in which the concrete is to remain, and is held until it becomes hardened, and that after six months the shell may be safely removed. I am not unmindful that some of the witnesses testify that this unevenness did not affect the pier; but does it not stand to reason that, if the shell or casing in which the concrete is to remain until hardened is uneven, leaning upstream, the concrete itself, which in this case, with the piling, constitutes the pier, would partake of this same unevenness and also lean upstream? The question to my mind answers itself. But, to say the least of it, if it be conceded that it did not affect the durability of the pier, was not this condition of affairs at that time, to use the language of counsel in his brief, 'an urgent invitation' to carry the casing on down to a better and more solid foundation?

"Respondent admits, however, that the center pier did not rest upon a suitable foundation, but insists that the bridge was erected at the point designated by complainant, and that such place was not suitable for the erection of the bridge. That complainant insisted upon the erection of the bridge at the place known as Martin's Ferry is not disputed, nor can it be disputed that respondent contracted and agreed to build the bridge at Martin's Ferry. As to whether or not the county designated the actual site upon which the bridge was constructed is a question of doubt. Commissioner Hughes testifies that the county did nothing more than desig-

nate that the bridge be built at Martin's Ferry, and his testimony further shows that Mr. Converse had made a survey of this location before he contracted for the work. Commissioner Martin says that he supposes that they located the bridge. The testimony of Judge Merritt on cross-examination shows that he was representing the Converse Bridge Company at the time of the location of this bridge, and he says that he and Mr. Martin and Mr. Richmond located the bridge. The witness Richmond says that Mr. Martin, Mr. Hughes, and Judge Merritt located the bridge, and that he (Richmond) 'mentioned to them that the condition of the river there was such that I believed it was a much better location 200 or 300 feet down the river.' Judge Merritt testifies that he never heard Converse say that his company could not build a bridge at this point, nor did he ever hear Richmond say anything of the kind. It seems, therefore, that respondent was equally represented at the selection of the actual site, and according to Judge Merritt he and Martin and Richmond actually located the bridge. It therefore does not appear that complainant has done more than locate the site at Martin's Ferry.

"But let it be conceded for the moment that the county did locate the site of the bridge just where it in fact was built, I do not see that respondent was excused. Does the testimony in the case show that this is a place where a bridge could not be constructed that would stand? I think not, very clearly. Richmond testifies that he has no judgment particularly as to the depth of the hard or packed sand lying under the 12 feet of movable sand, inasmuch as he did not go through it, but that he would not say that this packed sand was bottomless. Messrs. Furgerson and Richards made a careful survey of this location, and they testify that

they bored through this packed sand, and at a depth of about 25 feet they found rock. I will not go into a detailed discussion of this portion of the evidence; but the testimony in the case is clearly convincing that a better foundation for this pier could have been had. Nor would it matter that a much greater depth would have been necessary than 25 feet in order for a solid foundation to have been reached, for the respondent Converse Bridge Company owed it to the county to secure a solid foundation, if one was to be had, notwithstanding that it might have incurred much greater expense in so doing, and might have deprived it of all profit, or even caused a loss. They had contracted to build the bridge in a good, workmanlike manner, and, of course this could not be done unless a good foundation were had for the center pier, upon which rested the enormous weight of the superstructure. The witness Richmond testified that 'there is nothing impossible hardly among bridgemen in regard to bridges, and to make a bridge at this point stand, in my judgment, there would have to be excavation to a solid foundation in the bed of the river, and, in my judgment, a solid foundation is not there.' But upon what is his judgment based as to this foundation? He has not shown that he made any soundings in the river trying to locate a solid foundation, and he says himself that he does not know the depth of the packed sand, because he did not go through it. While, on the other hand, parties have made soundings and examinations of this point with this in view, and swear that solid foundation could be found at a depth of about 25 feet. Of course, the fact that respondent was not notified of the survey made by those employed by the county is wholly immaterial, as the county was under no such duty to respondent, and respondent could have made like survey if they

saw proper. The witness Richmond uses this expression in his testimony also, as follows: 'In my judgment, it could not hardly be made to stand by driving piling, and especially for a bridge of this kind. It is very difficult to drive piling through shifting or quick sand.' He says that it could not hardly be made to stand, and that it is very difficult to drive piling through shifting sand; and an examination of his testimony makes the impression that this bridge could have been properly constructed, but that it would have been attended with many difficulties, unless his judgment that there is no solid foundation there is to be taken to the exclusion of all others. I am therefore convinced that a better foundation for this center pier could have been obtained.

"It is further insisted that at this place there were strong cross-currents in the river, caused by a rock projection above the bridge and a cove; that, on a rise in the river, these cross-currents would come with great force, and thereby cause any foundation to undermine. The answer sets up that at the time this bridge fell there was an unusual freshet, an unusual rise in the river, and that logs and timber were floated down against this center pier, and was also one of the causes of its fall. This latter contention as to the logs being thrown against the center pier is not supported, in my judgment, by the testimony of any of the witnesses in the case, and is not set up as a reason for the fall of the pier by the superintendent of the work, the witness Richmond, who, being asked what caused this center pier to fall, says: 'In my best judgment, the direct cause of the bridge falling was the cross-current of the water at that place, and possibly an unusual rush of water.' He nowhere states in his judgment floating logs or timber contributed to the fall of the bridge. The

witness McGowan (and the respondent submits on his testimony) says that he passed the bridge in a skiff on the morning of the day the bridge fell that afternoon or evening, and there were no logs or timber against any part of the bridge; that he passed the bridge frequently from time of its completion to the time of its fall, and he never knew of any timber lodging against any part of the bridge. He further swears that the rise in the river got to be about 12 feet, and as a logman he regarded a rise of 12 feet 'hardly a good river for logging,' and that he has known a rise of 26 feet in the river of 1896, and there were frequent rises of from 15 to 18 feet. I do not find that he is in this regard contradicted. The witness R. T. McDavid testified that he was at the bridge a few days before its fall, and there were no logs or timber against any part of the bridge; but while he was there the bridge was cracking, and it made three distinct noises like it was giving way, and that he heard these sounds plainly some 200 feet from the bridge. At that time the rise in the river was not exceeding 3 feet. On cross-examination this witness also places the bend or curve in the river about 200 feet above the bridge. It is clear, therefore, that the fall of the pier was not caused by any jam of logs or timber against it.

"The superintendent of the work, however, has testified that in his judgment the cause of its fall was the cross-current at this place, and possibly an unusual rush of water; but he further says that during the time they were at work on the bridge there was no decided or unusual blowing out of the sand at the place where the center pier was erected, except that on the upper side of the pier the sand would blow out as they lowered the casing to about the depth they would sink the casing, but that this was not true except on that side, and that

the sand around the other part of the pier remained in
a fairly normal condition, and that the sand washed
out on the upper side to an extent not exceeding 4 feet
around the shell, and that at this particular place the
sand probably washed out 3 or 4 inches below the bot-
tom of the shell as it was sunk. He further testifies
that during the construction of the bridge, and after the
second pier was commenced, there was a rise in the riv-
er of an average of from 2 to 5 feet each week, and
that there were three rises in the river of greater size
than these, one to the extent of about 11 feet and the
other to about 8 feet. Most certainly the testimony of
this witness, who was in charge of the construction of
the bridge, and who is shown to be an  experienced
bridge builder, falls far short of proving that the cross-
currents of which he testified were of such character
and so violent at this point as to undermine any foun-
dation of any pier, but has on the other hand somewhat
contrary effect. This witness, in answer to the question
if those piling driven in this center pier at that place
to the depth of only 15 feet were not very liable to wash
out, used this language: 'I did not think so at that
time.' While engaged in the construction of this center
pier, a most important part of the work, and that which
no doubt called for the close attention of this superin-
tendent, it would seem that, if the cross-current at that
point were of such destructive character, his opportu-
nity for observing it during the erection of this pier was
most excellent, and yet he testifies that he did not think
at that time that these pilings were likely to be washed
out, and, as before shown by his testimony, there were
frequently rises in the river during the construction of
this pier, one 11 feet and two 8 feet.

"In addition to this evidence, it is shown by the testi-
mony in the case that the rock projection and the cove re-

ferred to is about 200 feet above the bridge, and the witnesses Furgerson and Richards, who made the survey and measurements, testify to the same. They further testify that they made examination, and found no cross-currents. And the witnesses Albertson, Barefield, and Watson (W. E.) testify to the same, and that the cross-currents are caused by this rock projection and cove, which is 200 feet above the bridge, and that they do not extend towards the bridge more than about 50 feet, where they lose their force. Some of the witnesses who testify to the contrary in regard to the exact location of the cross-currents do not show that they have made examination of the site with this in view, and are giving their recollection of the location and of how the water is at that point, and also show that these cross-currents lose their force as they go down the river; but some place the cove at a much nearer distance from the bridge than the others. The weight of the evidence establishes to my mind that these cross-currents were not of such destructive nature as to undermine any foundation at this point, or render the location unsafe for the erection of a bridge of the character called for by the contract. That there was much sand in the river, and that this sand would blow out when there was a rise in the river, would surely not argue that this was therefore an unsuitable place to erect a bridge, as sandy bottoms in streams of extreme Southern states are the rule, according to the witness Richmond, for the respondent, and he says that they are deceptive, and according to his experience and observations that the sand bars are constantly shifting; but it will not be contended that therefore bridges of this character cannot be made to stand across the streams of the extreme Southern states.

"But if it be believed that this river had a solid foundation, or better foundation than that upon which rested this center pier, of which fact I am thoroughly convinced, then it must be admitted that the respondent has given the bridge no test as to whether or not it could be made to withstand the currents, as the pier was not sunk below the sand to a good foundation. If respondent's superintendent had knowledge of the fact that this place was unsuitable for the erection of a bridge, and that the pier was not resting upon a solid or sound foundation, and that a bridge could not be made to stand at that place, was it not, of course, his duty to so notify the commissioners, and the duty of the respondent to decline for this reason to construct the bridge? But nothing is said as to this to the complainant. The bridge is examined by the commissioners, who see no fault. The superintendent is present, and says nothing as to the foundation. If he knew then what he testified to upon this trial, was not the concealment of so vital information a concealment of such material fact as to constitute a fraud? As I understand it, fraud is not one of the essentials to a recovery in a case of this character, as the case rests upon a failure of consideration; but, if fraud were necessary, it would be well-nigh established by this evidence as to this point, if the superintendent had the information at the time. If he did not know at that time the matters to which he now testifies as to the condition and unsuitableness of the location, considering his opportunity for knowing and his experience in this character of work, the weight of his evidence would, of course, necessarily be greatly diminished. The complainant let the contract for the construction of this bridge at Martin's Ferry, and the respondent agreed and contracted to build the bridge at this place, and in furtherance of its

agreement did so construct the bridge at this location, and I am persuaded that the respondent cannot now be heard to say that the place was unsuitable and thereby avoid liability. The above discussion, however, has been based upon the supposition that this would constitute a complete defense if established, and the evidence fully and satisfactorily convinces me that this bridge could have been built to stand, and that the location is not so unsafe that a bridge could not be built there, and that this bridge, for the reason given in this opinion, was not properly constructed. It matters not how difficult might have been the undertaking, if the bridge could have been so constructed at this place as to stand, the respondent Converse Bridge Company was under duty to build it, regardless of the cost or any loss occasioned thereby.

"In addition to the cancellation of the outstanding warrants, the complainant seeks for a judgment against respondent for the amount heretofore paid on the work, less any credits to which respondent might be entitled. It is unquestionably the general rule that, when a court of equity has once obtained jurisdiction of a controversy for any purpose, it will retain such jurisdiction for the purpose of administering complete relief and doing entire justice with respect to the subject-matter, and so relief of equitable character may thus be incidentally obtained, when an original bill would not lie for that relief alone.—16 Cyc. 106-108; *Kilgore v. Kilgore*, 103 Ala. 614, 15 South. 897; *Houston v. Faul*, 86 Ala. 232, 5 South. 433; *Ware's Adm'r v. Russell*, 70 Ala. 174, 45 Am. Rep. 82; *Price Ex. v. Carney*, 75 Ala. 546. The fifth headnote of the decision of *Price Ex. v. Carney, supra,* reads as follows: 'When a court of equity has acquired jurisdiction of the primary purpose and object of a suit, it will settle the litigation, although it may

involve the adjudication of mere legal questions, without remitting the parties to a court of law for the adjustment of legal rights which are consequental in the case or incidental.' The last headnote of the case of *Ware's Ad'r v. Russell, supra,* is to the same effect, and I quote it also for convenience: 'It is a very general principle in a court of equity that, when it has acquired jurisdiction of the primary objects and purposes of a suit, because of the inadequacy of legal remedies, it will settle the litigation and do complete justice between the parties, without remitting them again to a court of law; and in so doing the court follows the law, deciding legal questions as they would be decided at law.' It seems, therefore, to be the well-established rule and often recognized by the Supreme Court, and I am therefore of the opinion that this court, having acquired jurisdiction of the oustanding warrants on account of the inadequacy of the legal remedy, will retain jurisdiction for all purposes, and settle the controversy in all respects between the parties, and has the jurisdiction to render judgment, if found proper, for any amount against respondent that might be ascertained to be due, without remitting complainant to a court of law.

"The complainant acknowledges the value of the material to be $1,000 used by the American Bridge Company in the construction of a bridge for complainant with the consent of complainant, and that this amount should be credited to respondent, and offers to do so. It seems, however, there is doubt as to whether or not this is all the material that was used. If the end pier was used, and not included, for this complainant should also be made to account. It would seem, therefore, that this would necessitate a reference in this case, and such will be the order at this time. A reference is further necessary for the purpose of ascertaining the amount

of damages suffered by complainant on account of the defective construction of this bridge. By the bill as amended the complainant offers to do equity. Under the facts of this case, I am at this time of the opinion that the measure of damages is the difference between the value of the bridge constructed as it was and its value if it had been constructed in accordance with the contract. This will, of course, have to be determined by reference, so as to ascertain to what extent the outstanding warrants are to be canceled and what amount of recovery, if any, the complainant is entitled to.—2 Sutherland on Dam. 482, as to measure of damages. The register will enroll the following decrees:

"This cause was submitted at the last term of this court upon pleadings and proof, as noted by the register, and held for consideration and decree in vacation. On consideration, the court is of the opinion that complainant is entitled to relief, and the court is further of the opinion that a reference is necessary. It is therefore ordered, and decreed that the register of this court proceed to hold a reference in this cause at such time and place as suits his early convenience, of which he will give the parties to this cause, or their solicitors of record, at least 10 days' notice, at which reference he will ascertain and report to this court at the next regular term thereof the following:

"(1) What material of the bridge which is the subject-matter of this suit was used by the county of Geneva, or used by any one by and with the consent of the complainant in this cause?

"(2) What was the value of such material at the time and situated as it was when so used?

"(3) What material or portion of the fallen bridge was so used and which is not included in the bill of complainant in this cause, and for which credit of $1,000

is offered? And, if any so used not so included, give its value separately.

"(4) What date, or at what time, was the material so used or taken?

"(5) What was the exact date on which the $2,480, amount of the first warrant, was paid by the treasurer ·of Geneva county, and to whom paid?

"(6) What is the amount and date of each warrant outstanding issued in payment of the bridge which is the subject-matter of this suit, and the exact date upon which each warrant is due or payable, and by whom held?

"(7) What is the difference between the value of the bridge, the subject-matter of this suit, constructed as it was, and its value had it been constructed in accordance with the contract?

"The register may use on this reference any evidence which has previously been taken in this cause, as well as such testimony as may be offered before him by any of the parties to this cause. He will make his report to this court at the next term of the court, and will accompany the report with the evidence taken down by him in writing on the reference."

W. O. MULKEY, and J. M. CHILTON, for appellant. The phrase "good workmanlike manner" means in such manner as good, practical bridge men would construct and finish·it.—30 A. & E. Enc. of Law, 1290; 55 Pa. St. Rep. 349; 2 Sutherlin on Damages, 488; *Clark v. Pope,* 70 Ill. 128. The county having selected the spot and designated it, assumes the risk incident to any defect · arising from soil conditions.—*Freeman v. Harris,* 9 Rob. 23; *Fletcher v. Seekell,* 1 R. I. 267. There can be no rescission under the facts in this case because the complainant used the bridge material and got the ben-

efit of it and made use of the same after the bridge had fallen.—*Eastern B. R. Co. v. Chapman,* 140 Ala. 440; *Jones v. Anderson,* 82 Ala. 302; *Young v. Arndt,* 86 Ala. 116; *Martin v. Martin,* 35 Ala. 560. If the theory of the bill is to establish an equitable set off against the demand by respondent then it must allege that respondent is insolvent.—*Tate v. Evans,* 54 Ala. 16; 65 Ala. 422; 65 Ala. 439; 76 Ala. 401; 78 Ala. 213; 78 Ala. 257; 102 Ala. 528; 144 Ala. 496; 21 L. R. A. 324; 16 Cyc. 233. The county commissioners by judgment accepted the bridge in question and that judgment is conclusive and binding except upon direct attack or for fraud in its rendition.—*Commissioner's Court v. Moore,* 53 Ala. 25; 84 Ala. 549; 98 Ala. 537; 105 Ala. 579; 115 Ala. 536; 143 Ala. 379; 101 Cal. 265; 98 Cal. 331. Counsel discuss other assignments of error not necessary to be here set out.

C. D. CARMICHAEL, for appellee. The bill was drawn in accordance with the principles of law set forth in the cases of *Com. Ct. v. Moore,* 53 Ala. 25 and *Jeffersonian P. Co. v. Hilliard,* 105 Ala. 576. The warrants are not commercial paper and the purchaser does not defend on that ground.—*Savage v. Matthews,* 98 Ala. 535. Hence, every defense available against the Bridge Company is available against the purchaser.—*Inloe v. Reike,* 56 Ala. 500; Sec. 5938, Code 1907. It is a familiar principle that when equity assumes jurisdiction for one purpose, it will settle all the equities between the parties and grant incidental relief that could not be obtained by an original bill for that purpose.—*Hughston v. Faulk,* 86 Ala. 232; *Kilgore v. Kilgore,* 103 Ala. 614; *Vick v. Beverly,* 112 Ala. 458; 16 Cyc. 107-109. This is a suit not by the bridge company for the price of the bridge and the principles discussed relative to the use of the mate-

rial and the acceptance of the bridge has no application. Counsel discusses the testimony and concludes that the chancellor's opinion was entirely consistent with the facts in the case and should be affirmed.

MAYFIELD, J.—The appellee, Geneva county, on November 8, 1902, entered into a contract with one of the appellants, Converse Bridge Company, a Tennessee corporation, by which the bridge company agreed to construct, for the county, an iron bridge across Choctawhatchee river at Martin's Ferry. The contract was duly executed, was in writing, and contained minute specifications as to the plans, and as to the character and quality of the bridge, materials, etc. The agreed price or cost of the bridge was $9,840, payable in five county warrants: One for $2,480, payable December 1, 1904; one for $1,984, due December 1, 1905; one for $1,888, due December 1, 1906; one for $1,792, due December 1, 1907; and one for $1,696, due December 1, 1908. The bridge was completed in January, 1904, and was inspected by the county commissioners, and accepted by them, for the county, on certain conditions which were fully complied with by the bridge company; and the commissioners then, by an order of the court, accepted the bridge and ordered the probate judge to issue the warrants in accordance with the contract, with a slight deduction as to one of them, in accordance with the conditions of acceptance above referred to. The warrants were issued accordingly and delivered by the county to the bridge company. The contract was thus completely executed by both parties, except as to the payment of the warrants as they matured. The first warrant was paid at maturity. The bridge fell before the second warrant was due. The county then filed this bill, against the bridge company and the county treasurer, to recover the

amount of the first warrant, and to enjoin the county treasurer from paying the outstanding non-matured warrants and to call in and cancel same. It was subsequently ascertained that one Probasco, a resident of Chattanooga, Tenn., was the owner and holder of the oustanding warrants, and he was made a party respondent, by amendment, for the purpose of having a cancellation of the warrants held by him. The county treasurer appears not to have defended except formally. The other respondents, strange to say, appeared, and defended by motions to dismiss for want of equity, demurrers, pleas, and answer. The original bill was several times amended, and later a new or amended bill was substituted, which was also amended. No special ruling on the motions or pleas appears to have been invoked, except as to the original bill. The cause was finally submitted on the amended bill, the amended answers, and the proof as taken by both parties; and the chancellor decreed complainant to be entitled to the relief prayed, and ordered an accounting, which was had. The report of the register was revised by the chancellor, and, as revised, was confirmed, and a decree entered, directing that the county treasurer be perpetually enjoined from paying the warrants and that they be surrendered and cancelled, and that the complainant have and recover of the bridge company $923.16, and that the respondent bridge company pay the costs of the suit. From this decree this appeal is taken, and appropriate errors are assigned.

It is conceded by counsel for appelllee that if the bill has equity, such as to warrant the relief granted, it is by virtue of the principles of law announced by this court in the cases of *Commissioners' Court v. Moore,* 53 Ala. 25, *and Jeffersonian Publishing Co. v. Hilliard,* 105 Ala. 576, 17 South. 112. The two learned chancel-

lors who passed upon the bill seem to have relied upon these two cases as giving equity to the bill, as quite an extended excerpt from the opinion in the former case is set out in the opinion of the chancellor as authority for the equity of the bill.   There are dicta in the opinion in *Moore's Case,* 53 Ala. 25, which, if decisive, would authorize a bill like this, but probably not this identical bill.   The dictum is as follows: "If, after the audit and allowance, a warrant is pursuant to the statute, drawn on the county treasurer, it is a mere authority to him to pay.   It is nothing more really than an order on the county itself, the debtor.—Dillon, Munic. Cor. §§ 406-412.   When such warrants have been illegally issued—issued without authority—or when any just defense exists against the claim which they evidence, the county may maintain a bill in equity for their cancellation.—Id. 412.   And this we incline to regard as the most appropriate remedy."   The case above referred to was not a suit in equity, but one in a law court, and the jurisdiction of equity to cancel was not involved on the appeal.   That part of the dictum stating that the court was inclined to the opinion that a bill in equity to cancel the warrants, under the conditions mentioned, would be the most appropriate remedy, was evidently based on the law as stated by Judge Dillon in his work on Municipal Corporations.   The text cited in the dictum does not support it to the full extent.   The proposition is thus stated in the text cited: "A municipal corporation is not estopped, after a warrant upon its treasury has been issued, to set up the defense of ultra vires, or fraud, or want or failure of consideration.   And it may maintain a bill in equity to cancel warrants illegally issued."   It does not say that it can maintain a bill to cancel the warrants for failure of consideration or for any other cause except illegality in their issuance.

There is no pretense in this case that the warrants were illegally issued, but the bill affimatively shows that they were legally issued—exactly as the laws of this state provide and contemplate that they shall issue—and that they were issued under and in accordance with a perfectly valid contract between the county and the bridge company, and upon a valid consideration, and that there was no fraud, actual or constructive, in the making of the contract or in the issuing of the warrants; and that there was nothing ultra vires in the making of the contract or in the issuing of the warrants. The only thing attempted to be shown, as to this contract or the issuing of the warrants, of which the county could complain, is that the bridge was not built, as provided in the contract, "in a good and workmanlike manner in accordance with the specifications," and that the bridge, after being accepted by the county and used for a year, fell, to the great damage of the county. The contract provided that "the erection is (was) to be carried on subject to the approval of the purchasers, or their engineer, and is to be completed ready for their use to their satisfaction." The bill avers that it was so carried on and completed to the satisfaction of the county, but that, on account of defective construction, it fell, to the damage of the county. A breach of the contract, or partial failure of consideration, is the only wrong or injury alleged. This, without more, cannot give a chancery court jurisdiction to annul the contract and cancel the warrants. If all that is averred in the bill to be true, and if it be construed most strongly against the bridge company, the company merely failed to comply fully with its contract; and if the county has any rights or remedy in a court of equity, it would be to specifically enforce its valid contract.—*Piedmont Co. v. Piedmont Co.*, 96 Ala. 389, 11 South. 332; *Birmingham Co. v. Elyton Co.*, 93

Ala. 549, 9 South. 235; 18 Ency. Pl. & Pr. pp. 806, 807, and notes, and pages 767, 770. The bridge company was certainly entitled to notice of its failure to comply, and an opportunity to carry out its contract if it had failed in the first instance. It should have been given the opportunity to rebuild the bridge and to make good the damages inflicted as a consequence of its first attempt. The contract, as it recites on its face, was nothing more nor less than one to construct, and then to sell a bridge to the county, with an opportunity to inspect after it was completed. The county could not accept and retain the bridge bought, and then ask a court of chancery to annul the contract ,cancel the warrants, and require the bridge company to refund the money paid. Such a bill was this, and it is without equity. Nor did the amendments, by offering to pay for the use of the bridge while it was standing, and to pay for the materials as for scrap iron or rubbish, give it equity, and thus wholly deprive the bridge company of the value of its labor and the other costs and expenses entering into the erection of the structure.—18 Ency. Pl. & Pr. 750, 751, and notes. The bridge company was entitled to rebuild and thus carry out its contract; it bearing, of course, all loss and damages, the proximate result of its delay, failure, or negligence in the first instance.

The bill is clearly without equity, in that it affirmatively appears that the county did not offer to restore the consideration or benefits received under the contract. An offer in the bill (for the first time) to do this cannot give it equity; and the same is certainly true of an offer by way of an amendment to the bill.—*Betts v. Gunn*, 31 Ala. 219. While the authorities are not uniform on this proposition, probably the weight and number, as above stated, are in favor of it. This court, however, holds that where rescission or cancellation of a con-

tract is sought in equity, on the ground of fraud, a resto-
ration of the consideration or benefit received, or an of-
fer to restore, is not a prerequisite to the filing of the
bill; but if the rescission sought be grounded on fail-
ure of consideration or of title, on mistake, or on any
cause other than fraud, then there must be an antece-
dent restoration of that received by complainant under
the contract, or an offer to restore.—*Garner v. Leverett,*
32 Ala. 410; *Bailey v. Jordan,* 32 Ala. 50.

This principle has been thus stated by Brickell, C. J.,
in the case of *Strong v. Waddell,* 56 Ala. 473: "(3) The
law ought to be regarded as finally and definitely settled
in this state, after the numerous decisions declaring it,
that a vendee who has gone into possession, under a
deed with covenants of warranty, or a bond stipulating
for the conveyance of title with covenants of warranty
on the payment of the purchase money, cannot, unless
there was fraud in the sale to him, or the vendor is in-
solvent, and therefore without ability to respond to his
covenants, so long as he remains in possession, either
at law or in equity, defend against the payment of the
purchase money.—*Magee v. McMillan,* 30 Ala. 420. (4)
If there be no fraud, and no covenant taken to secure
the title, the purchaser is remediless. The maxim caveat
emptor applies.—*Abbott v. Allen,* 2 Johns. Ch. (N. Y.)
523 (7 Am. Dec. 554) ; *Frost v. Raymond,* 2 Caines (N.
Y.) 188 (Am. Dec. 228; *Cullum v. Br. Bank of Mobile,*
4 Ala. 21 (37 Am. Dec. 725). If the purchase is made
without fraud or warranty, with full knowledge of the
defects in the title, the purchaser can have no just ground
of defense against the payment of the purchase money.
—*Greenleaf v. Cook,* 2 Wheat. 16 (4 L. Ed. 172)." This
same quotation was made by Clopton, J., in the case of
*Thompson v. Sheppard,* 85 Ala. 619, 5 South. 334. The
same doctrine is announced in the cases of *Jones v. An-*

*derson,* 82 Ala. 302, 2 South. 911; *Young v. Arntze,* 86 Ala. 116, 5 South. 253; *Martin v. Martin,* 35 Ala. 560.

It is not sufficient, to give the bill equity on this score, that it offers to allow respondents $1,000 for the material from the fallen bridge, used in the construction of the new bridge. If the contract is to be rescinded, the parties must be placed in statu quo. If the contract is rescinded, the bridge belongs to the vendor and the warrants belong to the county. The county can no more rescind the contract and retain the bridge and the warrants, than the bridge company could rescind it and retain the warrants and the bridge, in case the warrants should not be paid in full at maturity. If these warrants had not been paid at maturity, the bridge company could not enjoin the county from the use of the bridge, and recover possession of the structure, by offering to allow the $1,000 for the warrants which it retained. This, in effect, is what the bill in this case sought to do, and what the chancellor decreed should be done. The contract did not warrant that the bridge would stand for a given length of time; it only warranted or agreed that it should be built in accordance with given specifications, at a given place, and in a "workmanlike manner," and that it should be approved and accepted by the county. This was unquestionably done, with the exception that it was not done in "a workmanlike manner." There is also some dispute or question as to whether the exact location of the bridge was proper, and as to who was required to make this selection; but it is undisputed that it was built with the full knowledge of all the parties, and met their approval after it was completed. If the contract had contained an express warranty that the bridge would stand for a given length of time, assuredly the bridge company

would have been entitled to the opportunity to make good its warranty, by rebuilding the bridge and paying the damages consequent upon the delay. Every breach of a contract by one party thereto, does not work a rescission, and entitle the other party to a cancellation and to recover what he has paid, without restoring what he had received. There is no equity in the bill to cancel the warrants, if the contract is not rescinded.

It is conceded in this case by counsel for appellant, and it is undisputed law, that these warrants are not commercial paper, and that all defenses may be made against them, while in the hands of transferees, that could have been made against the original payees. It is not claimed that they were illegally or improvidently issued. They were unquestionably issued in accordance with a valid contract, and in accordance with the law providing for their issuance. The most that can be urged against them is a partial failure of consideration. This defense is adequate and complete in a court of law. There is no contention that the bridge company is insolvent and not able to respond in damages for the breach alleged. The injunctive feature of the bill can give it no equity. The bill does not show that an injunction is at all necessary for relief. The county treasurer is a mere agent of the county, and acts for the county. It is not made to appear that he has failed, or will fail, to discharge his duties. It is not necessary for a court of chancery to protect the county against itself. If the bill were filed by the taxpayers of the county, against the county or its officers, to prevent waste of the funds of the county, then the injunction might be necessary; but the county, in this case, can well protect itself without the aid of an injunction.

While the county could not cancel the warrants without the aid of a court of chancery, it can well prevent the

payment thereof, if they be not valid claims, by refusing payment. But, as we have shown before, the county is not entitled to a cancellation of the warrants. They are valid, and were not procured by any fraud; the only defense claimed being a partial failure of consideration. The bill and the answer of the county treasurer affirmatively show that he is friendly to the county; and he is represented by the same counsel who represent the complainant, and is, to all practical purposes, a plaintiff, and not a defendant in the suit. He expressly declares, in his answer that "he is friendly to the complainant, Geneva county." So the bill has no equity in this phase, and we are wholly unable to perceive any equity in the bill.

The remedy at law is adequate and complete. Equity will not assume jurisdiction solely for the purpose of awarding damages for a breach of contract, though it may, in proper cases, award such damages where necessary to do complete justice between the parties. This is not a separate and distinct ground of equity jurisdiction. The only grounds of equity jurisdiction attempted to be set up in the bill are, injunction, rescission of contract, and cancellation of the warrants. The bill is clearly insufficient as to any of these grounds. In fact, the bill is clearly one to recover damages for breach of a contract, and the injunction and cancellation are sought merely as ancillary to the recovery of damages for the breach complained of. The bill shows that neither injunction nor cancellation is proper or necessary.

A court of law, and not one of equity, is the proper forum, under all the averments of the bill, and unquestionably so under the bill, answer, and proof. If there could be said to be any doubt as to the want of equity in the bill, there certainly can be none when the bill, answers, and proof are all considered on final hear-

ing.   Whatever lingering doubt could be entertained as to want of equity in the bill for injunction or cancellation is entirely removed by the answers and proof.   It is wholly unnecessary to consider other assignments of error or other questions discussed in brief.

It is sufficient to say that the bill should have been dismissed on the final hearing, without prejudice to any of the parties, the remedy at law conclusively appearing to be adequate and complete.

DOWDELL, C. J., and SIMPSON, ANDERSON, McCLELLAN, SAYRE and EVANS, JJ., are of the opinion that the bill contains equity, and concur in the opinion of the chancellor as to his conclusions of the law, as stated in his opinion on pages 207 et seq. of the transcript.   The reporter will therefore set out the opinion of the chancellor, above referred to, in his report of the case.

Finding no reversible error in the record, the decree appealed from is affirmed.

Affirmed.

MAYFIELD, J., dissents.

